UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
UNITED STATES OF AMERICA

        -against-

SEAN NOVIS
GARY DENKBERG,

        Defendants.
----------------------------------------------------------------X

Docket No. 20-CR-335

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DENKBERG'S MOTION FOR A JUDGMENT OF ACQUITTAL**

## PRELIMINARY STATEMENT

The trial evidence established that, from the very start of his involvement in the direct mail business, Gary Denkberg sought out the advice of counsel. He did so because he wanted to be sure that he was in compliance with the law. Over the following thirteen years, Mr. Denkberg did not send out a single promotion without assuring that it was first reviewed by counsel. During that time, he was consistently advised by multiple attorneys – well respected experts in their field – that his direct mail business was lawful and that his mailings were not materially misleading under the applicable legal standards. There is no evidence that he intentionally hid anything from his counsel, or failed to adhere to their advice.

Under the circumstances, we respectfully submit that the Government failed to prove that Mr. Denkberg *did not* act in reliance upon the advice of his counsel. As set forth below, the Government was obligated to demonstrate – beyond a reasonable doubt – that Mr. Denkberg acted willfully: *i.e.*, with the bad purpose to either disobey or disregard the law.

In this regard, it was not enough for the Government to demonstrate that some unquantified percentage of the Defendants' customers were confused by the mailings – or even that the Defendants were aware of such fact. The question was whether the Defendants *knew* that their conduct crossed the line into illegality, and whether they set out to intentionally violate the law.

1

Given the undisputed testimony of the Defendants' attorney, Andrew Lustigman, the evidence in this case was legally insufficient to establish a willful violation of the law with respect to Counts One through Fifteen of the Indictment.

Likewise, the Government failed to adduce evidence that Denkberg even *saw* the promotions charged in Counts Sixteen through Nineteen, much less that he knowingly and willfully aided and abetted Messrs. Philips, Novis, or Priolo in the commission of a crime.

## ARGUMENT

I. **The Court Should Enter a Judgment of Acquittal with Respect To Counts One Through Fifteen Because the Evidence Demonstrates That Gary Denkberg Relied Upon the Advice of Counsel in Operating His Business**

In order to establish the Defendants' guilt, the Government was required to prove that they acted *willfully* – that is to say, "with the bad purpose to either disobey or disregard the law." *See* Jury Charge, TR 1878. "[I]n order to establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 191-92, 118 S. Ct. 1939, 1945 (1998), *citing Ratzlaf v. United States*, 510 U.S. 135, 149, 114 S. Ct. 655, 663 (1994) (willfulness element requires knowledge that conduct is unlawful).

Hence, where a defendant has been advised by counsel that his planned course of conduct is lawful, and where the defendant honestly accepts and relies upon such legal advice, there can be no crime – even if every other element of the offense has been made out. "[T]he thrust of an advice of counsel defense is that the defendant, on the basis of counsel's advice, believed his conduct to be lawful and thus could not be found to have had unlawful intent." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1195 (2d Cir. 1989). This is so even if the Government believes that counsel was wrong. As the Supreme Court has explained:

2

> if a man honestly and in good faith seeks advice of a lawyer as to what he may lawfully do . . . and fully and honestly lays all the facts before his counsel, and in good faith and honestly follows such advice, relying upon it and believing it to be correct, and only intends that his acts shall be lawful, he could not be convicted of crime which involves willful and unlawful intent; even if such advice were an inaccurate construction of the law.

*Williamson v. United States*, 207 U.S. 425, 453, 28 S. Ct. 163, 173 (1908).

Finally, as the Second Circuit has recently emphasized, advice of counsel is not an affirmative defense. *See United States v. Scully*, 877 F.3d 464 (2d Cir. 2017). Rather, the burden is on the Government to prove that, notwithstanding such advice, the defendant *knew* that his conduct was *actually unlawful*. That is a burden which the Government simply did not meet in this case.

While it is true that, in the context of a Rule 29 motion, a court must generally defer to the jury's choice of competing inferences, such inferences must nevertheless be reasonable and based upon the evidence. Indeed, "where a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible;" rather, the court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019).

As set forth below, the evidence in this case established that the Defendants sought out the advice of competent attorneys for purposes of complying with the law, that they disclosed all material facts to counsel, and thereafter acted in accordance with the advice received. Under the circumstances, no rational juror could conclude, beyond a reasonable doubt, that Mr. Denkberg *knew* that his conduct violated the law.

### A. The Defendant, in Good Faith, Sought Out the Advice of Competent Attorneys Before Taking Action

The undisputed evidence established that *all* promotions were reviewed and approved by counsel *before* being sent out. TR 263, 279, 285-86. The evidence demonstrated that the attorneys Denkberg sought out to do this work were not merely competent, but highly qualified.

In particular, Denkberg sought out the advice of Charles B. Chernofsky and the Lustigman Firm, both of whom were considered leading attorneys within the field. In many cases, the Defendant had *both* firms review his promotions at different times to assure legal compliance. TR 1513; 1554; *see also* Defendant's Exhibits (D)G2 & (D)G3 at Sections 2, 3, 6, 7, 10, 11, 12, 13, 17, 19.[1]

Andrew Lustigman – who testified for the defense – was a 1991 graduate of American University Washington College of Law, where he managed the law review and graduated in the top 5% of his class. TR 1499.

He joined his father's law practice – the Lustigman Firm – in 1995, specializing in trade regulation and advertising law. TR 1500. Lustigman testified that his father, Sheldon Lustigman, had been focused on direct mailing and "postal issues" since the late 1980's or early 90's. *Id*. The firm specialized in issues concerning truth in advertising, and advising clients as to whether their promotions complied with applicable legal standards. TR 1503. Andrew Lustigman testified that the firm did "a lot of sweepstakes work." TR 1505. He further testified that he kept abreast of industry trends to be sure he understood what was permitted under the law. TR 1542.

In 2011, the Lustigman firm merged with Olshan Frome Wolonsky, with Andrew Lustigman heading up the firm's advertising, marketing, and promotions group. TR 1500. The

---

[1] Defendant's Trial Exhibits (D)G2 & (D)G3 are attached as Exhibits A and B to the accompanying Declaration of Matthew W. Brissenden, hereinafter the "Brissenden Decl."

firm is considered one of leading marketing practices in the country. TR 1500. Andrew Lustigman has published numerous articles concerning marketing and advertising law, and regularly lectures on the subject at various venues, including the Federal Bar Association. TR 1501-1502.

Likewise, Charles Chernofsky (who was deceased at the time of trial) was considered a specialist in the direct marketing field. According to Andrew Lustigman, Chernofsky was "an industry lawyer for a very long time [and] very well respected in the direct mail industry." TR 1513.

Finally, there is no evidence that Gary Denkberg acted in "bad faith" in seeking out the advice of Lustigman and Chernofsky. As the Supreme Court has explained, a defendant acts in bad faith when he *knows* from the outset that his conduct is illegal: "no man can willfully and knowingly violate the law and excuse himself from the consequences there of by pleading that he followed the advice of counsel." *Williamson v. United States*, 207 U.S. 425, 453, 28 S. Ct. 163, 173 (1908).

There is simply no evidence to that effect in this case. According to Lustigman, Denkberg, in particular, "often" expressed his desire to be compliant with the law. TR 1540. And over the course of thirteen years, the Defendant, a layperson, was assured by multiple different attorneys – prominent experts in this field – that his conduct was, in fact, lawful. Indeed, even the Government's own witness, Adam Solomon, testified that Mr. Denkberg was acting in good faith and had every reason to believe, based on the advice he was given, that he was acting lawfully. TR 1068.

**B.     Defendant Consulted with Counsel for the Purpose of Securing Advice on the Lawfulness of His Future Conduct**

Lustigman testified that his firm was consulted to ensure that the Defendants stayed in compliance with all applicable laws and regulations. TR 1522.

5

In particular, the evidence demonstrates that Denkberg was told by multiple attorneys over the course of thirteen years that the legality of his company's mailings was dictated by the "reasonable consumer" standard. TR 1064, 1078, 1518, 1528, 1555-56; *see also* Defendant's Exhibits (D)G2 & (D)G3 (attached as Exhibits A and B to the accompanying Brissenden Decl.). Such attorneys repeatedly opined to Denkberg that, given the specific language suggested by counsel, and the extensive disclaimers contained in his promotions, no "reasonable consumer" would be deceived by such mailings.

At trial, of course, the Government took the position that such advice did not accurately reflect the law, and that the Defendants could be criminally liable if their mailings had the effect of confusing elderly persons suffering from cognitive impairment. TR 824, 1824, 1943. Indeed, prosecutors leaned heavily upon this theory in their presentation of the evidence, and the jury appears to have convicted Denkberg based upon precisely such a theory. *See* Court Exhibit 2.

However, even if one assumes that the Government's interpretation of the law is legally correct, and that Denkberg's attorneys were all wrong, that is beside the point.[2] The question, under the *Williams* standard, is whether Denkberg relied upon such advice to guide his conduct. And the answer to that question is clearly *yes*.

In this regard, the Court has not only of the testimony of the relevant witnesses, but *extensive* documentation concerning the advice sought and obtained by Mr. Denkberg.

Defense Exhibits (D)G2 & (D)G3 consists of hundreds of pages of correspondence between Mr. Denkberg and his counsel regarding every promotion ever used by Horizon

---

[2] In fact, the Government's theory of liability all but ignores the materiality requirement, which is the functional equivalent of the "reasonable consumer standard." Under the law, "a statement is material if the misinformation or omission would naturally tend to lead or is capable of leading a *reasonable* person to change his conduct." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (emphasis added)

Marketing Services, Inc. They document the painstaking review process undertaken as to each of these mailings, with multiple iterations being circulated prior to final approval. These documents demonstrate that counsel did not merely approve of such mailings, but in some cases *drafted* the very language which the Government would later claim to be materially misleading.

For instance, the exhibit includes correspondence between Mr. Denkberg and Charles Chernofsky concerning a 2012 iteration of the Jackpot Express promotion. On January 29, 2012, Mr. Chernofsky wrote to Mr. Denkberg, advising him that "[t]he standard used in reviewing an advertisement is that of the Reasonable Consumer Standard – how would a reasonable consumer interpret the advertisement." *See* Defense Exhibit (D)G3, Section 19A (attached as Exhibit B to the Brissenden Decl.). Mr. Chernofsky then proceeded to expressly advise Mr. Denkberg that he should use the very "*win opportunity*" language which the Government has characterized as misleading. Likewise, the correspondence shows that Chernofsky *himself* proposed the language contained in the opening statement of that promotion, which read:

> Authorizing instructions for issuance of this promotion were issued on _____, 2012. At such time all internal protocols and procedures for ensuring this letter was properly addressed and issued to you were executed by internal directive, and our offices are honored to certify in writing that access information confirming Award Opportunities FUNDS OF CASH AND PRIZED totaling $1,379,000 is now pending.

*Id*.

After Denkberg made the suggested changes to this promotion (including the above-language), a revised draft was sent to Mr. Chernofsky on January 31st. On February 7, 2012, Mr. Chernofsky wrote back to inform Denkberg that had reviewed the promotion "for compliance with the generally accepted principles governing advertising" and that "[t]he attached revision addresses the concerns I expressed in opinion letter of January 26, 2012." *Id.*

Again, this is but one example of the advice which Mr. Denkberg received time and again, on each and every promotion, before such mailings went out. There is no question that Denkberg consulted with counsel for the purpose of securing advice as to the lawfulness of his mailings before they went out.

      C.      **Defendant Made a Full and Accurate Report to His Attorney of All Material Facts He Knew**

The trial evidence also establishes that *nothing* was withheld from counsel. As noted above, the Defendants' employees testified that *all* mailings were furnished to counsel for approval before being sent out. TR 263, 279. Counsel was "looking at everything that [the Defendants] were mailing before they mailed it." TR 263. Complaints were also provided to counsel for review and response. TR 622; TR 1525; GX 396. Lustigman testified that such complaints were *never* ignored. TR 1526. Likewise, when Denkberg became aware of a potential investigation in late 2016, he immediately notified his attorneys, and again asked for assurance that all his mailings were in compliance with the law. GX 268.

Although the Government sought to demonstrate that Denkberg hid the existence of the April 2012 Postal Agreement and Consent Order from one of more of his own attorneys, that assertion was plainly untrue. To the contrary, Denkberg expressly asked *both* the Lustigman and Chernofsky firms to review the Postal Agreement, in order to assure that all future mailings complied with such agreement. He was repeatedly assured by all of his attorneys that he was in compliance with such agreement.

Hence – notwithstanding the fact that the original agreement was negotiated by Andrew Lustigman and his father – Denkberg gave it Mr. Chernofsky to review on March 22, 2012. Mr. Denkberg specifically asked Chernofsky to *again* review the Jackpot Express promotion

8

(discussed above) and another promotion in light of the Postal Agreement. *See* DG-3, Section 19B (attached as Exhibit B to the Brissenden Decl.).

After reviewing the Postal Agreement, Chernofsky *again* reiterated that the promotions were not materially misleading in light of their disclaimers and the phrase "win opportunity," and opined that such promotions "should be acceptable to the Postal Service." *Id*.

Likewise, the trial evidence unequivocally demonstrated that Denkberg repeatedly and *specifically* asked Lustigman's junior partner, Adam Solomon, to review his promotions to ensure that they were in compliance with the Postal Agreement. TR 883-884, 900-904, 1041-1049; *see also* Defendant's Exhibits (D)X, (D)A1, (D)B1, (D)C1, (D)D1, (D)E1, (D)F1 (attached as Exhibit C to the Brissenden Decl.).

To the extent that Mr. Solomon testified that he was unfamiliar with such agreement, he was either lying or profoundly derelict in his responsibilities as counsel.[3] In either event, it is crystal clear that Gary Denkberg was not seeking to hide the Postal Agreement from Solomon or any of his other attorneys.

**D.     The Defendant Acted Strictly in Accordance with the Advice of His Attorney**

Finally, the trial evidence established that Denkberg acted in strict accordance with the advice of his attorneys, and was anxious that his conduct should be within the law. As noted above, all promotional material was provided to counsel for review. TR 263, 279, 285-86. Any changes suggested by counsel were provided to the copywriter, and incorporated into the mailings. TR 264. Thereafter, the revised promotions were sent *back* to counsel for a final review, in order

---

[3]     Lustigman testified that the Postal Agreements were never concealed from Adam Solomon, and that Solomon was aware of such agreements and the circumstances surrounding them. TR 1532-34.

9

to ensure compliance. TR 264, 615. As a result, Andrew Lustigman testified as to his belief that all of the Defendants' promotions complied the applicable law. TR 1527-28.

On the advice of counsel, the Defendants also adopted a "no questions asked refund policy" and made sure that all clients who requested to be removed from the mailing lists, were, in fact, removed. TR 1519, 613, 627, 673. Customer complaints were never ignored. TR 1526.

Similarly, in the wake of the April 2012 Postal Agreement and Consent Order, both Mr. Denkberg and Mr. Novis "were adamant that they want[ed] to be in compliance with the 2012 order." The Defendant informed counsel that he "never want[ed] to be found to have violated a Government order." TR 1522. As a result of the Postal Agreement, "the standards applicable to them were tightened" with special attention given to the provisions of the Consent Order. TR 1522-23. On multiple occasions, Denkberg asked counsel to *re-review* promotions to confirm that they were in compliance with the Postal Agreement and Consent Order. *See* (D)X, (D)A1, (D)B1, (D)C1, (D)D1, (D)E1, (D)F1, *see also* (D)G3 Section 19B (attached as Exhibits C and B to the accompanying Brissenden Decl.). To that end, the Defendants even flew in their copywriter to meet with counsel in person, in order to assure that all of their future pieces were complaint with the agreement. TR 1535.

In the face of this voluminous evidence, the Government sought to demonstrate Denkberg's failure to comply with counsel's advice based upon a *single* instance which transpired immediately before the Defendant's business was shuttered for good in September of 2016. But far from demonstrating Denkberg's bad faith, such evidence *actually* shows his ongoing efforts to continuously ensure that his promotions were in compliance with the law.

In particular, during summation, prosecutors pointed to Government Exhibits 268, 288, 299, and 127, a series of documents which track the Defendant's efforts to assure the legality of the Jackpot Express promotion in light of the Government's 2016 investigation. TR 1653.

Hence, GX 268 shows that on August 22, 2016, Mr. Denkberg wrote to Sheldon and Andrew Lustigman, informing counsel of an apparent investigation being conducted by the Postal Service. In that letter, Mr. Denkberg notes in the wake of the 2012 Postal Agreement, he has "*ONLY* mailed promotions that had been reedited to be in compliance with the agreement." Nevertheless, Mr. Denkberg suggests that counsel should *again* review such pieces to assure compliance. *See* GX 268, attached as Exhibit D to the accompanying Brissenden Decl.

GX 288 appears to reflect two subsequent mark-ups to the Jackpot Express promotion. The first iteration of the markup, at page eight of GX 288, includes the following handwritten addition on the second page of the promotion: "*No purchase necessary to enter or win. A purchase will not improve chances of winning.*" *See* GX 288, attached as Exhibit E to the accompanying Brissenden Decl.

The second markup can be found at page four of GX 288. In a handwritten notation, counsel alters the above disclaimer (which is now type-written into the promotion) to include the below, bracketed language: "*No purchase necessary to enter or win. A purchase [from any sweepstakes sponsor] will not improve chances of winning.*" *Id*.

GX 299 is an email from Mr. Denkberg to the Lustigman firm dated September 14th, 2016 (eight days before his business was shut down). The email states:

> Hi Shelly,
>
> As per our meeting on Thursday September 8th, we have made the final suggestion you requested to the attached JPE091416 promotion.

11

>   You will also see as you requested the promotion name and & date of revision appear on the bottom of both pages. This promotion is: JPE091416.
>
>   <u>Please review the promotions with the changes and send us a final opinion.</u>

GX 299 (emphasis added), attached as Exhibit F to the Brissenden Decl.

Attached to the email is an updated draft of the Jackpot Express promotion, including the revised version of the disclaimer suggested by counsel at page four of GX 288.

Finally, the Government points to GX 127, an unrevised version of the Jackpot Express promotion which went out on September *16th*, 2016 – two days after Denkberg asked counsel to sign off on the new version (but before counsel responded). During summation, the Government argued that GX 127 was evidence of Denkberg ignoring his counsel's advice. TR 1653. But that argument was grossly unfair, because GX 127 was mailed out *before* counsel approved of the final changes reflected in the attachment to GX 299, and only six days before Denkberg's business was shut down for good. *See* GX 127, attached as Exhibit G to the Brissenden Decl.

In reality, GX 268, 288, and 299 show that – far from being indifferent as to the legality of his promotions – Denkberg was *extremely* concerned. In fact, the evidence shows that Denkberg, on his own initiative, was asking his attorneys to re-review promotions which they had already vetted and approved. In the case of the Jackpot Express promotion, this was at least the *fourth* time that Denkberg was asking for such input. Denkberg was not asking for (and paying for) such advice for no reason. To the contrary, the evidence demonstrates that Denkberg was intent on complying with the law, and that he consistently implemented any changes recommended by counsel. TR 1540. And if his business had not been shut down on September 22, 2016, the draft changes suggested in GX 288 would have undoubtedly been approved, finalized, and adopted into future mailings, *as they were in every single prior instance*.

12

The Government had at its disposal millions of documents relating to over thirteen years of business operations. The Defendant waived his attorney client privilege, and turned over voluminous communications with counsel. And yet somehow, this was the best – and indeed, the *only* example of purported "non-compliance" the Government could come up with. That prosecutors felt compelled to rely upon such a misleading argument speaks volumes as to the actual strength of their case.

### E. The Evidence Concerning the Defendants' Reliance Upon The Advice of Counsel Mandates a Judgment of Acquittal With Respect to Counts One through Fifteen

As described above, the evidence of reliance on counsel was overwhelming and conclusive. It is undisputed that Denkberg sought out and relied upon the advice of competent attorneys to operate his business. And the Government utterly *failed* to prove that Denkberg hid material facts from such counsel, that he ignored their advice, or that he knew such advice to be legally incorrect. Accordingly, because the Government failed to prove that Denkberg *willfully* violated the law, this Court should enter a judgment of acquittal with respect to Counts One, Two, Three, Four, Five, Ten, Eleven, Twelve, and Fourteen of the Indictment.[4]

### II. The Evidence Failed to Prove That Denkberg Willfully Aided and Abetted Shawn Philips, Jeffrey Novis, or Philip Priolo in the Commission of a Crime

The same evidence likewise dictates a judgment of acquittal with respect to Counts Sixteen through Nineteen, which charged Denkberg with aiding and abetting fraudulent promotions carried out by Shawn Philips, Jeffrey Novis, and Philip Priolo.

---

[4] Mr. Denkberg was acquitted on Counts Six, Seven, Eight, Nine, Thirteen, and Fifteen. Counts Sixteen through Nineteen, which related to the aiding and abetting charges, are addressed separately in Point II.

13

As this Court charged the jury, to establish aiding and abetting liability, the Government was obligated to prove that Denkberg knowingly and willfully participated in a scheme or artifice to defraud, with knowledge of its fraudulent nature and with the specific intent to defraud. TR 1903.

Taken in the light most favorable to the Government, the evidence demonstrated that Mr. Denkberg shared customer lists, and permitted Philips, Novis, and Priolo to utilize his staff for purposes of their own mailings. But given the legal advice that Mr. Denkberg was receiving, he had no basis to believe that such mailings were illegal. There is no evidence, for instance, to suggest that Denkberg understood the promotions sent out by Philips, Novis, and Priolo to be materially different from his own.

Indeed, there is no evidence that Mr. Denkberg even *saw* the mailings that are the subject of Counts Sixteen through Nineteen. The *only* evidence in this regard – Government Exhibits 144, 144A, 146 and 146A – show that Denkberg was emailed *pre-prints* of the NAC promotion (Count Sixteen) and the PTN promotion (Count Seventeen). Those pre-prints included *only* the underlying graphics and artwork, as well as legal disclaimers (which were identical to the legal disclaimers that Denkberg had been advised to use). The pre-prints provided to Denkberg *did not* include the actual text of the promotions utilized by Philips, Novis, or Priolo. *See* GX 144 & 144A, GX 146 & 146A, attached as Exhibits H and I to the accompanying Brissenden Decl.

The Government introduced *no* evidence to establish that Denkberg ever saw the actual text of such promotions, much less that he understood them to be fraudulent in a way that his own promotions were not. Likewise, there is no evidence that Denkberg saw *anything* relating to the promotions charged in Counts Eighteen and Nineteen. Nor is there any evidence that Denkberg saw complaints relating to any of these mailings.

14

Finally, while Denkberg would not have been privy to the specific, attorney-client communications taking place between Philips, Novis, Priolo, and their counsel, he knew – at a bare minimum – that all of their mailings were scrutinized by PacNet, which had its own legal compliance department. TR 297, 630, 1433. Indeed, PacNet's Service Agreement required all mailings be submitted to and authorized by their compliance department before going out. *See* GX 337 at pp. 4, 7, 17 (attached as Exhibit J to the accompanying Brissenden Decl.); *see also* GX 338.

In the absence of evidence to establish that Denkberg even *saw* the promotions in question, or was otherwise placed on notice that such mailings were violative of the law, the Government clearly failed to prove that Denkberg had "knowledge of their fraudulent nature."

### III.   Defendant Denkberg Joins in the Arguments Advanced by Sean Novis

In addition to the arguments set forth herein, Mr. Denkberg respectfully joins in the arguments advanced by his co-defendant, Sean Novis.

### CONCLUSION

The trial evidence – even viewed in the light most favorable to the Government – failed to establish a willful violation of the law by Gary Denkberg. Accordingly, for the reasons set forth herein, this Court should enter a judgment of acquittal with respect to each and every count of the Indictment.

Dated: Garden City, New York
August 15, 2022

Respectfully submitted,

By: /s/ Matthew W. Brissenden
Matthew W. Brissenden
Stephen P. Scaring
666 Old Country Road, Suite 501
Garden City, NY 11530

15