UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

     v.

SEAN NOVIS and
GARY DENKBERG,

       No. 21-cr-00335

    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X


**GOVERNMENT'S CONSOLIDATED OPPOSITION TO DEFENDANTS' RULE 29 MOTIONS**

## Table of Contents

I.    INTRODUCTION ............................................................................................. 5

II.   GENERAL LEGAL PRINCIPLES ............................................................... 6

III.  DISCUSSION .................................................................................................. 7

  A.    Count 1: A Rational Jury Could Find That Defendants Conspired to Defraud Individuals by Mailing Fraudulent Prize Notices ................................................ 7

    i.    The jury correctly concluded that the Defendants knowingly entered into a joint enterprise to conduct the sweeps-report mailing operation. ................................ 8

    ii.   A rational jury could conclude just from the prize notices that the objective of the Defendants' conspiracy was committing mail fraud ............................................ 9

    iii.  The Defendants' receipt of complaints and similar evidence also demonstrates that mail fraud was the conspiracy's object ............................................................. 11

    iv.   That victims were successfully defrauded also supports the jury's verdict and shows that mail fraud was the conspiracy's object. .................................................... 13

  B.    Counts 2–7: A Rational Jury Could Find Both Defendants Committed Mail Fraud ..... 14

  C.    Counts 8–11: A Rational Jury Could Find that the Defendants Committed Wire Fraud. 17

  D.    Counts 12–15: A Rational Jury Could Find Both Defendants Guilty of Using Fictitious Names in a Mail Fraud Scheme. ........................................................................ 18

  E.    Counts 16–19: A Rational Jury Could Conclude that Both Defendants Aided and Abetted Shawn Phillips, Philip Priolo, and Jeffrey Novis in Committing Mail Fraud ........... 23

  F.    A Rational Jury Could Reject the Defendants' Advice-of-Counsel Defense .................. 27

    i.    The jury was free to reject Lustigman's testimony in whole or in part, because the jury could have found Lustigman's testimony was not credible and undermined the advice-of-counsel defense ............................................................................. 29

    ii.   Sufficient evidence supports a finding that the defendants did not seek legal advice in good faith. ...................................................................................... 32

    iii.  The Defendants did not consult with counsel for the purpose of securing advice on the lawfulness of their possible future conduct. .................................................. 35

    iv.   The Defendants did not make full and accurate reports to their attorney of all material facts that they knew ..................................................................................... 35

    v.    Sufficient evidence supports a finding that the Defendants did not act strictly in accordance with the advice of their attorney in good faith .................................... 37

## Table of Authorities

**Statutes**

18 U.S.C. § 1342 ............................................................................................ 18, 22

18 U.S.C. § 1343 ................................................................................................... 17

18 U.S.C. § 1349 ..................................................................................................... 7

18 U.S.C. § 2 .......................................................................................................... 23

**Cases**

*Holland v. United States*, 348 U.S. 121, 140 (1954) ............................................. 6

*United States v. Alcius*, 952 F.3d 83, 86 (2d Cir. 2020) ....................................... 6

*United States v. Ames Sintering Co.*, 927 F.2d 232, 234 (6th Cir. 1990) ............... 17

*United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) ................................. 6

*United States v. Best*, 219 F.3d 192, 199 (2d Cir. 2000) ................................ 23, 24

*United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) ................................. 14

*United States v. Briscoe*, 65 F.3d 576, 583 (7th Cir. 1995) ................................. 17

*United States v. Cote*, 544 F.3d 88, 99 (2d Cir. 2008) ........................................ 31

*United States v. Cunningham*, 723 F.2d 217, 232 (2d Cir. 1983) .......................... 7

*United States v. Frank*, 494 F.2d 145 (2d Cir. 1974) .......................................... 18

*United States v. Friedman*, 998 F.2d 53, 56 (2d Cir. 1993) .......................... 6, 7, 29

*United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) ............................. 7

*United States v. Johnson*, 945 F.3d 606, 613 (2d Cir. 2019) .............................. 22

*United States v. Kuthuru*, 665 F. App'x 34, 40 (2d Cir. 2016) ............................ 33

*United States v. Mahaffy*, 693 F.3d 113, 123 (2d Cir. 2012) ............................... 8

*United States v. Maniego*, 710 F.2d 24, 28 (2d Cir. 1983) ............................. 7, 29

*United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)...................................................6

*United States v. Moseley*, 980 F.3d 9, 27 (2d Cir. 2020)........................................................11

*United States v. Napout*, 332 F. Supp. 3d 533, 554-55 (E.D.N.Y. 2018)...................................22

*United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011)................................................31

*United States v. Pierce*, 785 F.3d 832, 838 (2d Cir. 2015).....................................................6

*United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996)......................................................23

*United States v. Press*, 336 F.2d 1003, 1010 (2d Cir. 1964)...............................................33, 34

*United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015)........................................................8

*United States v. Samaria*, 239 F.3d 228, 234 (2d Cir. 2001).................................................8

*United States v. Scully*, 877 F.3d 464,  476 (2d Cir. 2017.....................................................27

*United States v. Shellef*, 732 F. Supp. 2d 42 (E.D.N.Y. 2010)...........................................22, 33

*United States v. Smith*, 198 F.3d 377, 383 (2d Cir. 1999)....................................................23

*United States v. Stanley*, 928 F.2d 575, 577 (2d Cir. 1991)...................................................7

*United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003).................................................8

*United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972)....................................................7

*United States v. Velasquez*, 271 F.3d 364, 372 (2d Cir. 2001)...........................................7, 29

*United States v. Weaver*, 860 F.3d 90, 92 (2d Cir. 2017)..............................................11, 13, 14

*United States v. Wiley*, 846 F.2d 150, 154 (2d Cir. 1988).....................................................24

*United States v. Willis*, 14 F.4th 170, 183 (2d Cir. 2021).......................................................6

**Other Authorities**

William Strunk Jr. & E.B. White, The Elements of Style (Longman Publishers, 4th ed.,

    2000)……………………………………………………………………………31

4

## <u>GOVERNMENT'S CONSOLIDATED OPPOSITION TO DEFENDANTS' RULE 29 MOTIONS</u>

The United States of America, by and through the undersigned attorneys, hereby submits its Response to the Defendants' motions under Fed. R. Crim. P. 29, filed August 15, 2022.

## I.     <u>INTRODUCTION</u>

The Defendants received a fair trial over the course of more than three weeks and their convictions should stand. The convictions are supported by hundreds of exhibits—nearly all of which originated from their own office and that of their long-term employee Cathy Johnson—and the testimony of their employees of many years, victims and victims' family members, facilitators, and law enforcement agents. This was not a trial in which the prosecution introduced small quantities of equivocal evidence that could have gone either way. To the contrary, the Government's evidence was overwhelming. The evidence demonstrated beyond a reasonable doubt how the Defendants perpetrated their scheme under cover of countless names, business entities, post office boxes, and other artifices to conceal their identities from victims who were bombarded with fraudulent prize-notice mailings under rigorously planned mailing schedules.

The content of Defendants' Rule 29 motions is by now familiar to the Court—they raise the same arguments in the same ways as they did throughout the trial, in that the Defendants: (a) assume that most of the prosecution evidence does not exist; (b) claim their witness and exhibits provided the only credible evidence at trial; (c) blame victims for being "unreasonable" in relying on promises made in the Defendants' prize notices; (d) insist the word "opportunity" absolves them of guilt; and (e) argue in circular fashion that the Government did not adduce sufficient evidence of fraud because the prize notices were not fraudulent. The Defendants address the trial evidence not as it is, but only as they wish it to be, and in so doing they turn

Rule 29 on its head and draw conclusions favoring only the Defendants. Moreover, the Defendants ignore the role of the jury in weighing evidence, assessing credibility, resolving inconsistencies, and deciding the Defendants' guilt. The Defendants' Rule 29 motions should therefore be denied.

## II.    GENERAL LEGAL PRINCIPLES

A defendant faces a "heavy burden" when challenging the sufficiency of the government's evidence. *See, e.g.*, *United States v. Alcius*, 952 F.3d 83, 86 (2d Cir. 2020). When reviewing the sufficiency of the evidence, a court must "view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Pierce*, 785 F.3d 832, 838 (2d Cir. 2015). In this context, the government's evidence is not required to rule out every possible hypothesis of innocence. *Holland v. United States*, 348 U.S. 121, 140 (1954); *United States v. Willis*, 14 F.4th 170, 183 (2d Cir. 2021).

Where proof of an element is through circumstantial evidence, a court must not "weigh . . . competing inferences and explanations" to determine "which explanation is more likely." *United States v. Friedman*, 998 F.2d 53, 56 (2d Cir. 1993); *see also United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) ("it is the task of the jury, not the court, to choose among competing inferences").

In making these determinations, a court should "sustain the jury's verdict if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Pierce*, 785 F.3d at 838 (emphasis in original). The court may not assess witness credibility, resolve inconsistent testimony against the verdict, or otherwise weigh the significance of the evidence. *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (reversing, in part,

judgment of acquittal); *United States v. Cunningham*, 723 F.2d 217, 232 (2d Cir. 1983) (trial judge may not "set aside the guilty verdict simply because he would have reached a different result if he had been the fact-finder"). The court may grant the motion only where the evidence pointing to guilt is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999). Otherwise, a court "must let the jury decide the matter." *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972).

Finally, where a defendant presents evidence after denial of a motion for acquittal at the close of the government's case, "the defendant waives any claim as to the sufficiency of the Government's case considered alone." *United States v. Maniego*, 710 F.2d 24, 28 (2d Cir. 1983); *see also United States v. Velasquez*, 271 F.3d 364, 371–72 (2d Cir. 2001) (noting that "a defendant whose motion for acquittal at the close of the Government's case is denied must decide whether to stand on his motion or put on a defense, with the risk that in doing so he will bolster the Government case enough for it to support a verdict of guilty.") Thus, the jury may disbelieve the defendant's evidence and use its disbelief to "supplement" the government's case. *United States v. Stanley*, 928 F.2d 575, 577 (2d Cir. 1991). Specifically, the jury is "entitled to conclude that [the defendant's] version of the events was false and thereby infer [the defendant's] guilt." *Friedman*, 998 F.2d at 57.

## III.   DISCUSSION

### A.  Count 1: A Rational Jury Could Find That Defendants Conspired to Defraud Individuals by Mailing Fraudulent Prize Notices.

Conspiracy to commit mail fraud under 18 U.S.C. § 1349 requires proof (1) that two or more persons entered into the particular unlawful agreement charged in the indictment, (2) that the objective of the conspiracy was to commit the crime of mail fraud; and (3) that the defendant

7

knowingly, intentionally and willfully became a member of the conspiracy. Tr. at 1891 (Court's charge); *United States v. Mahaffy*, 693 F.3d 113, 123 (2d Cir. 2012) (describing elements of conspiracy); *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015) (noting that proof of an overt act is not required under 18 U.S.C § 1349). To prove conspiracy, the evidence needs to be "sufficient to permit the jury to infer that the defendants and other alleged coconspirators entered into a joint enterprise with consciousness of its general nature and extent," which may be demonstrated through circumstantial evidence in light of the secretive nature of conspiracies. *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003). The government need not show an explicit agreement, but rather, may show "that the parties have a tacit understanding to carry out the prohibited conduct." *United States v. Samaria*, 239 F.3d 228, 234 (2d Cir. 2001). The Government presented voluminous evidence upon which the jury could have found the Defendants guilty of conspiracy to commit mail fraud.

      i.    **The jury correctly concluded that the Defendants knowingly entered into a joint enterprise to conduct the sweeps-report mailing operation.**

Extensive direct and circumstantial evidence supports the jury's inference that the Defendants agreed to join together and conduct their sweeps report scheme. The Defendants' employees testified, among other things, that the Defendants: began working together in the operation in the early 2000s; were the owners of the operation; were the bosses and made the managerial decisions in the day-to-day operations; set the mailing schedules; controlled the money generated by the scheme; shared an office; made decisions concerning the employees' hiring and schedules; set the employees' pay; owned and shared the mailing lists with one another; received complaints from victims and gave directions concerning the handling of those complaints; and otherwise controlled the operation. *See, e.g.*, Tr. at 106–124 (Jacquard); Tr. at 501–19, 637–38 (McDevitt); Tr. at 642–44, 646, 649–50, 678–90 (Lilienkamp). The Defendants

even used their initials to name one of the shell companies used in the course of the scheme, JGS Entertainment Inc., the "G" and "S" standing for "Gary" and "Sean," the Defendants' first names.  Tr. at 118 (Jacquard).

Documentary evidence also supports the jury's verdict on this point.  Most importantly, the Defendants signed nearly identical agreements with the Postal Inspection Service stating that their scheme would be permanently discontinued and abandoned, yet both Defendants were simultaneously making arrangements to continue the scheme under newly formed shell companies, "Horizon" and "Quantum."  GX 14, 15, 338, 341 and GX 342 at 213–215 and 255–57; Tr. at 386–87, 398–99 (Edgehille).  The Defendants witnessed one another's signatures on new payment processing agreements with PacNet, the Canadian payment processor, once the 2012 Postal actions were wrapping up.  GX 338; Tr. at 1020 (Rodriguez).  Bank records also show that the Defendants were both officers of one of the shell corporations and authorized users of one or more bank accounts used in the later phase of the scheme.  *See, e.g.*, GX 1005.

> ii.     **A rational jury could conclude just from the prize notices that the objective of the Defendants' conspiracy was committing mail fraud.**

A rational jury could have easily found that mail fraud was the conspiracy's object.  The jury could have concluded this based simply on the prize notices themselves and from the testimony of victims and their family members.  The prize notices appeared to be personalized to the recipients and included fake business names, fictious identifies of purported officials, and logos, borders, and seals intended to make the documents look official, engender trust, and make the recipient believe they had already won money or a prize.  *See, e.g.*, GX 119, 121, 121A, 126, 127, 129–37; Tr. at 745–46, 793 (Ressler).  Most of the prize notices contained no contact information other than post office boxes on the exterior and return envelopes, and occasionally on the portion of the prize notice the victim would mail back, so that once a victim

9

mailed their money, they had no way to know who had sent them the prize notice. *See, e.g.*, GX 121, 129–37. The so-called "disclaimers" were placed and printed to minimize their importance and to make them difficult to read. Tr. at 764–66, 779–80, 786–90 (Ressler). These individual prize notices were then aggregated into "mailing plans" (also called "mailing schedules") that bombarded victims with a dozen or more "back end" mailings in a short timeframe, usually less than a month, once they responded and paid in response to the single "front end" mailing. *See, e.g.,* Tr. at 152–167 (Jacquard); Tr. at 1154–69 (Rodriguez); GX 152A at 1-3, 141-42; 152C at 1, 144-45, 171, 214-15; 153, 153A; 154 at 32-37. These techniques were incredibly successful, to the tune of nearly $80 million in revenue generated by the Defendants' operation alone. GX 654. The Defendants' efforts at concealment were also successful, because victims did not even know who had sent them the prize notices. For example, the only information Paul Murrell had after he sent in his checks was the initials of the fake companies—he did not know their names. Tr. at 95–96 (Murrell); GX 574–611. When asked if she ever asked for a refund for the checks her father sent, Ann Rivenburg said she "wouldn't know who to contact." Tr. at 331 (Rivenburg). She also testified that her father had no idea who was sending the prize notices. Tr. at 337 (Rivenburg). Sharon Soltis agreed that all of her father's checks were made out to "different individuals, companies" and all of these entities were identifiable only with initials. Tr. at 344 (Soltis); GX 527–46. Marlene Montilla testified that her husband's checks to Defendants' companies were all made out to three-letter entities. Tr. at 554 (Montilla); GX 500–12, 514–25. All of the checks to Defendants' operation were made payable to such entities known only by such initials, from which the jury was free to infer the Defendants' intent to further conceal their activities. GX 500–12, 514–25, 527–70, 573–611.

Moreover, the jury was free to note the disconnect between the prize notices and the sweeps report booklets (e.g., GX 159), and to conclude that Defendants' purported "sales" of the cheaply produced and low-quality booklets were mere pretext for the prize notices. None of the testifying victims or their family members testified that they intended to purchase a small booklet of public sweepstakes information. Indeed, the prize notices themselves use misleading language like "Actual Prize Entry Directive Report," "Entrant Procedure and Compliance directive," and "Issue the Data and Report delivery proceedings." GX 119 at 2, 130 at 2, 131 at 2. This language is inherently deceptive, insofar as it avoids being "too true" about the fulfillment items—the sweeps report booklets—that the Defendants sent to their victims. Tr. at 780 (Ressler).

### iii. The Defendants' receipt of complaints and similar evidence also demonstrates that mail fraud was the conspiracy's object.

The jury was also presented with extensive evidence showing the Defendants received a constant stream of complaints and other correspondence showing that people who received their prize notices thought they had won—yet once on notice, the Defendants never altered their practices in response. The jury was free to infer from this evidence that the Defendants possessed unlawful intent. *United States v. Moseley*, 980 F.3d 9, 27 (2d Cir. 2020) (noting that "complaints about illegal practices by Moseley's business served to put Moseley on notice of their potential illegality. That he continued to operate his business despite this notice makes the complaints probative of his intent to violate the law"); *United States v. Weaver*, 860 F.3d 90, 92 (2d Cir. 2017) (noting frequency of customer complaints). Such correspondence and complaints were found at the Defendants' Underhill Boulevard office and at the caging location on Owen Street. Tr. at 935–36 (Cinnamo); Tr. at 1102 (Rodriguez). These included complaints from state attorneys general and other government officials, the Better Business Bureau and other consumer

11

advocates, and victims and their family members. *See, e.g.*, Tr. at 1102–29, 1190–1209, 1214–18, 1223–37, 1253–72 (Rodriguez); GX 308, 309, 325, 351, 354, 356, 381, 395, 402, 404, 418, 490.

While not a "complaint," as such, the Postal administrative actions also serve to show that mail fraud was the conspiracy's object. Postal Inspector Attorney Edgehille testified extensively about these actions, why they were undertaken, and the verbiage of the documents in the case files, including testimony concerning the Defendants' agreements to permanently discontinue and abandon the prize-notice scheme. Tr. at 386, 398–99 (Edgehille). The complaints contained within GX 14 and 15 detail the schemes and how victims were deceived. GX 14 at 20–21; GX 15 at 18–19. That Defendants blithely continued with the scheme shows their intent to commit mail fraud, and the jury was correct in so concluding.

The Defendants' Rule 29 motions focus in part on the word "opportunity" inserted into many or all of the prize notices, arguing that this renders them lawful. *See, e.g.,* Novis Br. at 7–8. But Defendants ignore the context provided by the Government's evidence—they used "opportunity" in the face of a massive stream of complaints and letters from victims asking about their prize money, received throughout the conspiracy in such volume that responding became the number one "customer service" task in the Defendants' operation. GX 353. The jury was correct in concluding both that "opportunity" did not render the prize notices truthful, and that the Defendants knew well victims were still deceived even when "opportunity" was in the prize notices. Moreover, "opportunity" was used in each of the four exemplar prize notices attached to the complaints in the Postal administrative actions. GX 14 at 28, 33; GX 15 at 28, 32. The Defendants had more than mere notice that "opportunity" did not absolve them of liability for fraud—they were sanctioned in 2012 despite using that term, but nevertheless they continued

their scheme. The jury was free to conclude that the Defendants knew "opportunity" was not understood by victims to mean that they were going to receive a small booklet of worthless sweepstakes rules. In the light most favorable to the Government's case, the jury was entitled to conclude that the prize notices were facially fraudulent even if the Defendants said "opportunity" in the prize notices.

      iv.    **That victims were successfully defrauded also supports the jury's verdict and shows that mail fraud was the conspiracy's object.**

Similarly, victim testimony and other evidence shows that the prize notices had the intended effect—victims were defrauded—from which the jury was free to infer the Defendants' intent to defraud. *Weaver*, 860 F.3d at 97 (noting the "the significance in a fraud case of proof of actual harm befalling the victim as a result of the scheme is that it may serve as circumstantial evidence from which a jury could infer the defendant's intent to cause harm"). Karel Dupre testified that he sent in money because "it looks as though I had won…[N]ow I'm going to get something." Tr. at 591 (Dupre). Paul Murrell testified that he sent in checks because he thought he was going to get "large sums of money." Tr. at 82 (Murrell); GX 574–611. Ann Rivenburg testified that her father, Harry Ranker, told her that he had won the lottery. Tr. at 317 (Rivenburg). Harry Ranker sent nearly $2,000 in response to the Defendants' prize notices; Tr. at 321 (Rivenburg); GX 547–570. Sharon Soltis testified that her father, John Single, sent money in response to the prize notices, "many, many times," thinking he was going to win and that he was a winner. Tr. at 341 (Soltis); GX 527–546. Ashley Seip testified that her grandfather, Wendell Brooks, told her that he believes to this day he had won a prize and was just waiting for it to arrive. Tr. at 463–464 (Seip); GX 573. *See also*, GX 654, 655, 655A–655H (summary of transaction data and data related to victim accounts presented at trial).

### B. Counts 2–7: A Rational Jury Could Find Both Defendants Committed Mail Fraud.

To prove mail and wire fraud, the Government must establish the following elements: (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme. *Weaver*, 860 F.3d at 94, citing *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015). The evidence outlined above in Section III.A. supports the jury's conclusion that there was a "scheme to defraud" and that money was the object of the scheme. Additional evidence supports the jury's conclusion that the Defendants committed these specific acts of mail fraud charged in Counts 2 through 7.

In Count 2, the jury found that the Defendants defrauded Art Montilla on or about September 11, 2015. GX 515 is a check with that date in the amount of $19.99 from Mr. Montilla, payable to ERCC. Exhibit 102A is an ERCC prize notice with keycode 13915. GX 655—data from the Defendants' transaction databases related to specific victims—shows on page 2, line 55 that Mr. Montilla paid $19.99 in response to an ERCC prize notice with keycode 13915 in September 2015. Marlene Montilla testified about how her husband was defrauded by the Defendants. Her husband "lived for the mail to be delivered…" and would get about eight to ten daily letters, claiming he won something. Tr. at 551–53 (Montilla). He would tell her to come home from work because he had gotten a letter that said he had won millions, and that he had to respond to within a short period of time. Tr. at 553–54 (Montilla). Her husband sent in at least 23 checks to the Defendants, all to three-letter entities, and he never won anything. Tr. at 554–55; GX 500–12; 514–25.

In Count 3, the jury found that the Defendants defrauded John Single on or about October 19, 2015. GX 544 is a check with that date from Mr. Single, payable to I.D.R. in the amount of

$24.99.  GX 118A is an IDR prize notice dated in October 2015 with keycode 14040P.  GX 152C at 171 shows that the Defendants mailed IDR prize notices with keycodes 14040P and 14038H in October 2015.  GX 655 at page 10, line 313 shows that Mr. Single paid $24.99 in response to an IDR prize notice with keycode 14038H in October 2015.  Sharon Soltis, John Single's daughter, said her dad thought "he was a winner," and kept the prize notices because he was waiting to win money.  Tr. at 340 (Soltis).  He would send checks, written to three-letter entities, in response to the Defendants' prize notices—he mailed Defendants at least 20 checks and responded to the Defendants' scheme and those they aided and abetted dozens of times.  Tr. at 344 (Soltis); GX 527–46; GX 655 at 5–12.

In Count 4, the jury found that the Defendants defrauded Harry Ranker on or about October 19, 2015.  GX 566 is a check from Mr. Ranker with that date, payable to IDR in the amount of $24.99.  GX 118A is an IDR prize notice dated in October 2015 with keycode 14040P.  GX 152C shows that the Defendants mailed IDR prize notices with keycodes 14040P and 14038H in October 2015.  GX 655 at page 4, line 130 shows that Mr. Ranker paid $24.99 in response to an IDR prize notice with keycode 14038H in October 2015.

In Count 5, the jury found that the Defendants defrauded Harry Ranker on or about October 31, 2015.  GX 569 is a check from Mr. Ranker with that date, payable to IDR in the amount of $24.99.  GX 118A is an IDR prize notice dated in October 2015 with keycode 14040P.  GX 152C at 171 shows that the Defendants mailed IDR prize notices with keycode 14040P in October 2015.  GX 655 at page 4, line 131 shows that Mr. Ranker paid $24.99 in response to an IDR prize notice with keycode 14040P in early November 2015.  Ann Rivenburg, Harry Ranker's daughter, described how her father would receive prize notices in the mail and told her that he had "won the lottery." Tr. at 317 (Rivenburg).  The promise of a cash windfall

15

led Mr. Ranker to think of using the money to take his wife to well-regarded hospitals for her Parkinson's disease. Tr. at 317 (Rivenburg). Harry Ranker sent 24 checks totaling nearly $2,000 to the Defendants, but he never received the promised prizes. Tr. at 323–24 (Rivenburg); GX 547–70. Ms. Rivenburg eventually had to close her father's bank account. Tr. at 323 (Rivenburg).

In Count 6, the jury found that Defendant Novis defrauded Karel Dupre on or about September 16, 2016. GX 125 is the response portion of the RDD prize notice that was sent to Mr. Dupre on or about September 9, 2016, showing Mr. Dupre's name, address (which is redacted), signature, and keycode 14920; the document also reflects that Mr. Dupre sent cash. GX 121 is a complete copy of the RDD prize notice dated September 9, 2016 and bearing keycode 14920. The RDD prize notice's response portion was intended to look like a cashier's check. GX 121, 650; Tr. at 782 (Ressler). Mr. Dupre testified early in the trial, stating that he sent in cash thinking he was "going to get some money, like maybe a thousand dollars or something like that." Tr. at 590 (Dupre). He never won anything. Tr. at 590 (Dupre). When asked why he believed he was going to get money, he responded, "Because it looks as though I won, and they asked me to sign it. And I said, yes, I will sign it, and that it is. Now I'm going to get something." Tr. at 591 (Dupre).

In Count 7, the jury found that Defendant Novis defrauded Elvin Grindy on or about September 16, 2016. GX 126 is the response portion of the RDD prize notice that was sent to Mr. Grindy on or about September 9, 2016, showing Mr. Grindy's name and address (which is redacted), bearing his signature, and reflecting keycode 14920; the document also reflects that Mr. Grindy sent cash. GX 121 is a complete copy of the RDD prize notice dated September 9, 2016 and bearing keycode 14920. Mr. Grindy died before trial. Tr. at 959 (Rodriguez).

16

However, testimony and records proved that Mr. Grindy received the RDD prize notice and paid Defendant Novis in response.  Tr. at 218–19 (Jacquard), Tr. at 669 (Lilienkamp); GX 126.  The RDD prize notice's response portion was intended to look like a cashier's check.  GX 121, 650; Tr. at 782 (Ressler).

### C.  Counts 8–11: A Rational Jury Could Find that the Defendants Committed Wire Fraud.

Counts 8–11 charged the Defendants with wire fraud.  The jury convicted Defendant Novis on all wire fraud counts, including those wires directed by his co-conspirator, Defendant Denkberg.  The jury convicted Defendant Denkberg for the two bank wires he personally directed (Counts 10 and 11), but not for those directed by his co-conspirator, Defendant Novis (Counts 8 and 9).

The elements of wire fraud under 18 U.S.C. § 1343 directly parallel those of the mail fraud statute but require the use of an interstate or foreign wires in furtherance of the scheme. *United States v. Briscoe*, 65 F.3d 576, 583 (7th Cir. 1995) (citing *United States v. Ames Sintering Co.*, 927 F.2d 232, 234 (6th Cir. 1990) (per curiam).  For the reasons discussed above, sufficient evidence existed that the Defendants created a scheme to defraud victims of money by sending fraudulent prize notice mailings.  The Defendants used also wires to conduct their scheme and get their money.  They would send checks they received in New York from their customers to PacNet, the payment processor in Canada, and PacNet would wire them their proceeds.  Tr. at 601 (McDevitt); Tr. at 1020 (Rodriguez).

The Government sufficiently proved the specifics of each wire fraud count.  To prove Count 8, the Government introduced an email dated January 11, 2016, from Defendant Novis to PacNet requesting a wire of $16,172.14 from the DM Consulting Services US account to DMCS Inc.  GX 652.  Then, for Count 9, the government introduced a transfer of this same amount to

Direct Marketing Consulting Services, Inc.'s Bank of America account on January 12, 2016.  GX 1004M at 3.  Defendant Novis was the signer on the signature page of this account and listed as the company's president.  GX 1004.

For Count 10, the government introduced an email dated June 9, 2016, from Defendant Denkberg to PacNet requesting a wire of $12,052.15 from the Horizon Marketing Service Inc. PacNet account to the Horizon Marketing Services Inc. Bank of America account.  GX 651. Finally, for Count 11, the Government introduced a transfer of the same amount into the Horizon Marketing Services Inc. Bank of America account on June 9, 2016.  GX 1005R at 3.  Horizon Marketing Services Inc.'s Bank of America records identify Defendant Denkberg as its president and Defendant Novis as its vice president.  GX 1005.  Thus, the jury properly concluded that the Defendants committed wire fraud.

### D.  Counts 12–15: A Rational Jury Could Find Both Defendants Guilty of Using Fictitious Names in a Mail Fraud Scheme.

The Government introduced ample evidence from which the jury reasonably inferred that the Defendants used fictitious names and titles for the purpose of furthering their mail fraud scheme.  18 U.S.C. § 1342.  The jointly proposed §1342 charge—which the Court incorporated into the final jury instruction—was adapted from the §1342 fictitious names instruction the Second Circuit upheld in *United States v. Frank*, 494 F.2d 145 (2d Cir. 1974).  In *Frank*, the Second Circuit interpreted the §1342 fictitious names statute and ultimately affirmed the defendants' convictions for using fictitious names to further a mail fraud scheme.  *Frank* is the applicable precedent here, and the Court's adaptation of the *Frank* §1342 instruction set forth the correct elements.  They are:

> *First*, that there was a scheme or artifice to defraud, or to obtain money or property by materially false pretenses, representations or promises as alleged in the indictment;

18

> *Second*, that the defendant knowingly and willfully participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with specific intent to defraud;
>
> *Third*, that in execution of the scheme, the defendant used or caused the use of the mail as specified in the count of the indictment you are considering; and
>
> *Fourth*, that within such mailing the defendant you are considering used a fictitious, false, or assumed name or title <u>for the purposes of carrying out such fraudulent scheme.</u>

*See* Court's Charge, Tr. at 1897–98 (emphasis added). The Court clarified that the first three elements of the fictitious names charge "are identical to the three elements of mail fraud which I previously identified for you" and, "[a]s a result, those same instructions will apply here." *Id*. at 1898. The Court continued:

> … this offense requires you find a fourth element, namely, that the defendant used a false, fictitious, or assumed name or title within the mailing that you are considering <u>for the purposes of carrying out the scheme to defraud.</u> In this regard, it is not enough to find that the defendant you are considering used a fictitious name or title in a mailing. Rather, you must find, beyond a reasonable doubt, that <u>the defendant's purpose in using such a false or assumed name or title was to carry out the offense of mail fraud</u> as I have previously defined that offense for you.

*Id*. (emphasis added).

At trial, the Government introduced abundant evidence from which the jury reasonably inferred that the Defendants used fictitious names and titles in order to further their fraudulent mass-mailing scheme. For example, Tom Ressler testified that the Defendants' prize notices were designed to look like official documents that would deceive victims into believing they "had already won the money." Tr. at 775, 785 (Ressler). To this end, Mr. Ressler testified that he created fake signatures to make it appear that the fictitious officials had individually signed each notice. Tr. at 785–86 (Ressler). From this evidence, the jury could have reasonably

inferred that the Defendants used fictitious names and titles in order to bolster the apparent legitimacy of their prize notices and deceive more victims into responding.

Cheryl Jacquard's testimony also demonstrated that the fictitious names and signatures enhanced the apparent legitimacy of the fraudulent prize notices. She consistently testified that she had never worked with or even met any of the fictitious officials who purportedly signed the Defendants' prize notices. For example, she testified that she had never worked with or heard of Andrew McNair, President of the International Data Reporting Center and the signatory on the IDRC prize notice. Tr. at 213–14 (Jacquard). *See also* GX 118A. When presented with the Defendants' RDD mailing, Ms. Jacquard testified that Jim Reitman, Prize Data Release Officer appeared to have signed the notice. Tr. at 220–22 (Jacquard). *See also* GX 125. She also testified that she did not know any Jim Reitman and that no one at the Defendants' companies had ever held the title of "release data officer." Tr. at 220, 222 (Jacquard). She similarly testified that Robert Kimball, Senior Officer of Report Data Confirmation Offices and George Hamilton, President of Hamilton Prize Reports did not exist. Tr. at 230, 244 (Jacquard). From this testimony, the jury could have reasonably inferred that the Defendants created fake names with fake, official-sounding titles in order to make the prize notices seem more real—and thereby deceive more victims into sending responses.

The Government also introduced ample evidence from which the jury reasonably inferred that the Defendants used fictitious names to hide their identities from victims, thereby encouraging victims to make repeated payments. For example, Marlene Montilla testified that she sent over one hundred requests to have her husband removed from fraudulent mailing lists. Tr. at 558 (Montilla). When asked whether she ever specifically asked the Defendants' companies to stop mailing, she testified, "I have no idea. I don't know who your client was."

20

Tr. at 583 (Montilla). Paul Murrell testified that he had "no idea" who was sending the numerous prize notices he received. Tr. at 95 (Murrell). Ann Rivenburg similarly testified that her father, Harry Ranker, did not know who was sending him the prize notices. Tr. at 337 (Rivenburg). When defense counsel asked Ashley Seip whether she had ever seen solicitations from the Defendants' companies, she said that she was not sure. Tr. at 481 (Seip). Defense counsel then asked, "So you're not here to testify about my client's company," to which Ms. Seip responded, "I'm here to testify that this is my grandfather's signature on this solicitation." *Id*. *See also* GX 573.[1] Ms. Seip further testified that the Defendants' names did not appear anywhere on the fake notice and that she could not have known they were responsible for sending it. Tr. at 483 (Seip).

Through the testimony of Postal Inspector Rodriguez and Exhibit 655, the Government showed that these victims sent many payments in response to the Defendants' fraudulent prize notices. Tr. at 1000–02 (Rodriguez). Exhibit 655 highlighted that Paul Murrell sent more than 65 payments, Wendell Brooks sent 17 payments, and Art Montilla and Harry Ranker each sent more than 30 payments to the Defendants. From this evidence, the jury could have reasonably inferred that the Defendants used different fictitious names on every prize notice in order to Defraud the same victims repeatedly.

Defendant Novis incorrectly states that the government must prove that the fictitious *names* defendants used in their mailings in and of themselves were "material" to the victims' decisions to send payments. *See* Novis Br. at 9–10. That is not the correct standard from *Frank* and appears nowhere in the statutory text. The cases defense counsel cite in support of that

---

[1] Defense counsel stipulated that the defendants sent the Exhibit 573 mailing to the victim. *See* Stipulation Regarding Exhibits, Apr. 25, 2022, ECF 66.

proposition do not even reference the use of fictitious names or the §1342 statute. *See United States v. Shellef*, 732 F. Supp. 2d 42 (E.D.N.Y. 2010) (evaluating defendant's Rule 29 motion following his conviction for filing a false tax return, wire fraud, money laundering, and conspiracy to defraud the government) and *United States v. Johnson*, 945 F.3d 606, 613 (2d Cir. 2019) (affirming defendant's conviction for wire fraud in connection with a foreign currency exchange transaction). The Court's instruction correctly required the Government to prove only that the defendants used fictitious names and titles <u>for the purpose</u> of furthering a mail fraud scheme. The relevant piece is the Defendants' intent to defraud—not the perceptions of individual fraud victims.

Moreover, a Rule 29 motion is not an appropriate vehicle for defense counsel to argue for a new legal standard. *United States v. Napout*, 332 F. Supp. 3d 533, 554–55 (E.D.N.Y. 2018) (rejecting defendant's argument for a different legal standard because he never raised the issue at trial and "cannot now launch a backdoor attack on the Court's jury instructions in the form a Rule 29 motion challenging the sufficiency of evidence"). If the Defendants wished to argue that materiality should be an element of the fictitious names charge, they should have—and could have—done so prior to the Court's instructions. Instead, defense counsel joined in the Government's proposed jury instructions, including the §1342 instruction that did not require the Government to prove that fictitious names were material to victims of the scheme, and failed to raise this issue at the charge conference.

Additionally, at trial, the Defendants introduced IRS policy documents to suggest that they could have used fictitious names and titles to protect their own safety, as IRS government officials are permitted to do in the exercise of their duties. Tr. at 1322–24 (Rodriguez). The jury reasonably rejected the inference that the Defendants adopted fake names and titles purely due to

22

safety concerns. Instead, the jury embraced the far more logical inference that the Defendants assumed numerous different fictitious names and titles for the purpose of deceiving victims into sending repeated payments without ever discovering that the same two people—Sean Novis and Gary Denkberg—were responsible for sending the prize notices.

### E. Counts 16–19: A Rational Jury Could Conclude that Both Defendants Aided and Abetted Shawn Phillips, Philip Priolo, and Jeffrey Novis in Committing Mail Fraud.

Sufficient evidence supported the jury's decision to find both Defendants guilty of Counts 16 through 19, aiding and abetting mail fraud. Counts 16 and 17 related to fraudulent mailings that the Defendants' employees managed for Shawn Phillips and his "Lakeside" and "Parkside" companies. Tr. at 519:20-25 (McDevitt). Counts 18 and 19 related to fraudulent mailings that the Defendants' employees managed for Philip Priolo and Jeffrey Novis and their "Winner's Circle" and "Feel Lucky Group" companies. Tr. at 520:4-5 (McDevitt). The jury was free to infer from the evidence that the Defendants—close business partners—knew exactly what their longtime employees were doing.

To convict a defendant of aiding and abetting a substantive offense under 18 U.S.C. § 2, the Government must prove (1) that the underlying crime was committed by someone other than the defendant and (2) that the defendant either acted or failed to act, with the specific intent of advancing the commission of the crime. *United States v. Smith*, 198 F.3d 377, 383 (2d Cir. 1999), citing *United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996). To prove that a defendant acted with that specific intent, the Government must prove that he knew of the proposed crime. *United States v. Best*, 219 F.3d 192, 199 (2d Cir. 2000). However, the defendant need not know all of the details of the crime to be guilty of aiding and abetting, provided "the evidence shows that he joined in the venture, shared in it, and that his efforts contributed towards its success."

*Id.* at 200, citing *United States v. Wiley*, 846 F.2d 150, 154 (2d Cir. 1988) (internal quotation marks omitted).

The Defendants joined in Phillips' and Priolo and Jeffrey Novis's ventures and mutually prospered with their enterprises. Phillips, Priolo, and Jeffrey Novis followed in the exact same misleading business model as the Defendants. Tr. at 520:6-15 (McDevitt). The Defendants' employees performed the same tasks for these three individuals as they did for the Defendants. Tr. at 115:9-116:11 (Jacquard); 521:4-7, 531:12-18 (McDevitt); 692:13-25 (Lilienkamp). These tasks encompassed the full lifecycle of a mass-mailing operation: customer data analysis, inventory monitoring, mail scheduling, proofreading, and caging services. *Id.*; Tr. at 111:4-13 (Jacquard). While Defendant Novis instructed the employees to begin working for these three individuals, Tr. at 115:25-116:2 (Jacquard), both Defendants shared an office near their employees; neither of them worked offsite. Tr. at 119:20-23, 120:8, 121:6 (Jacquard). Additionally, toward end of the scheme in 2016, the operation only had three employees left at the Underhill location, all doing the same work they had done for years. Tr. at 121:9 (Jacquard). The jury could easily conclude from the employees' testimony about direction they received from the Defendants that both Defendants knew what their three employees were doing day to day.

The Defendants also contributed to the success of the crimes committed by these three individuals with their employee- and data-sharing pact. In fact, a person who responded to the Defendants' prize notices would have their mailing information quickly shared with Phillips, Priolo, and Jeffrey Novis for their next mailing cycle, and vise-versa. Tr. at 649:2-650:17 (Lilienkamp). In short, a victim of one quickly became a victim of all. It was reasonable for the jury to conclude that the Defendants knew what Phillips, Priolo, and Jeffrey Novis mailed

24

because the Defendants relied on their data to target the Defendants' own mailings more efficiently and to increase their own victim pool.

The Defendants concede that a rational jury could conclude that their employees aided Phillips, Priolo, and Jeffrey Novis in these ways, including by sharing mailing lists and permitting these three individuals to use their staff for purposes of their own mailings (Denkberg Mot. at 14). Nevertheless, the Defendants argue that the Government presented no evidence from which a rational jury could conclude that they had knowledge of these mailings' fraudulent nature. In essence, the Defendants believe that a piece of evidence (e.g., an email) must show the Defendants seeing every word of the Phillips, Priolo, and Jeffrey Novis prize notices. This argument ignores direct evidence presented at trial and reasonable inferences that the jury could draw from that evidence.

First, the jury was not required to stick its head in the sand like the Defendants suggest they themselves did with respect to Phillips's and Priolo and Jeffrey Novis's mail fraud schemes. In fact, the evidence presented at trial proved that Defendant Denkberg received significant portions of Phillips's fraudulent prize notices. Among other evidence and testimony, Denkberg received copies of Phillips's Lakeside pre-print forms for the mailings related to Counts 16 and 17. GX 144, 144A (Count 16, at 3-6), 146, 146A (Count 17). Contrary to Defendant Denkberg's assertion (Denkberg Mot. at 14) that these pre-prints have no text, Exhibit 144A and 146A have ample text that sets forth the same deceptive features found in the Defendants' own mailings, such as fake seals, language creating a false sense of urgency, fake company officer signatures verifying the document, and confusing language similar to that used in the course of the Defendants' scheme.

For example, one of the prize notices states, amongst other things, that it is a "Pending Award Notification" and a "Rush Notice" for a "Filed Matter." GX 144A at 4. The same prize notice also contains a section entitled "Final Report Dept. Confirmation and Approval Section," which claims:

> It's Guaranteed That: Upon the completion and return of this document within the time-zone specified, all Entrant Procedural Directives as Reported for the available and Guaranteed sweepstakes *CASH/PRIZE* opportunity Now Scheduled for Payment to selected Winner(s) will be issued in the Full Amount to the address listed above and located in: CITY/STATE:)

*Id.* at 5. Exhibit 146A's second page states the recipient "Is The Guaranteed Receiver Of The Available Cash & Awards Opportunity As Reported On Ledger Of Entrant Directives On File For Prompt Release In The Full And Total Amount Stated," is signed by the deceased Allan Pinkerton, and claims it is "100 Percent Guaranteed! Extremely Time-Sensitive" next to a $1.2 million figure "exactly." These are not simply blank pre-prints of graphics. The jury could easily infer that the Defendants knew exactly what kind of mailings Phillips was sending out because they contained language that was similar to their own mailings (often written by Phillips). Denkberg also provided advice for Phillips's mailing schedules, GX 370 and 370A, and Phillips had been the Defendants' own copywriter, i.e., the creator of their own fraudulent prize notices. Tr. at 630:5-10.

Second, Defendant Novis also had an essential role in supporting these three individuals' fraudulent mailing schemes. Defendant Novis personally instructed the E.C. Logistics employees to execute service agreements and begin working for the three men in the first place. Tr. at 520:25–521:16; 525:4–20 (Jacquard); GX 192. Defendant Novis received copies of the invoices showing the work performed for his father and longtime copywriter, including "[b]illing for clerical, scheduling, list orders, inventory control and inventory analysis, graphics, signoffs,"

26

"sweepstakes research," and data processing. Tr. at 527:17–23 (Jacquard); GX 188A at ¶1.1,188B at 192, 194, 195, 195A. Defendant Novis was even aware that his father and Priolo were generating Attorney General complaints. GX 410.

The Defendants' argument also misses the point: they were convicted for aiding and abetting these individuals' schemes to defraud, of which the mailings identified in Counts 16 through 19 were simply specific examples. Again, the Defendants argue based on what they wish the evidence to have been, rather than what it is. The jury properly concluded that the Defendants aided and abetted mail fraud where the testimony of the Defendants' employees and their own emails show (1) the Defendants' instructions to carry out tasks associated with the Phillips, Priolo, and Jeffrey Novis schemes, (2) the sharing of victim mailing data between Defendants and Phillips, Priolo, and Jeffrey Novis, (3) the Defendants' awareness of the nature of the mailings their employees were working on at their direction, (4) the Defendants' advice concerning mailing schedules for these schemes, and (5) the Defendants' awareness that the Phillips, Priolo, and Jeffrey Novis prize notices generated law enforcement interest. Thus, the guilty verdict on Counts 16 through 19 should be affirmed.

### F.  A Rational Jury Could Reject the Defendants' Advice-of-Counsel Defense.

The Court denied the Defendants' Rule 29 motion at the end of the Government's case. Tr. at 1609. Because the Defendants' case-in-chief presented only one witness (Lustigman) and additional documentary evidence purporting to show that the Defendants sought and received the advice of counsel, effectively the only substantive difference between the motion already denied and the present motions is whether, in light of the additional advice of counsel evidence, the Government proved the Defendants' intent to defraud beyond reasonable doubt. *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017*)*.

The Defendants were permitted to give full voice to the advice-of-counsel defense at trial, which the jury largely, if not completely, rejected. This included the Defendants' extensive evidence and argument around advertising law and the "reasonable consumer" advertising standard that served as the basis of advice the Defendants received during the conspiracy period.[2] *See, e.g.*, Tr. at 1502–10, 1518, 1527–28, 1555–56 (Lustigman); Tr. at 1665, 1667, 1686–87, 1711, 1713, 1724, 1729 (defense summation). Once evidence is sufficient to raise it, the defense of advice of counsel is not, as the Defendants erroneously suggest, dispositive of guilt—rather, it is a means to raise reasonable doubt around a defendant's intent where the government retains the burden to prove unlawful intent. This issue was briefed in the United States' trial memorandum, Dkt. No. 51, at 19–21, incorporated herein by reference.

Extensive evidence revealed the Defendants' fraudulent intent beyond a reasonable doubt, despite the Defendants' practice of having their prize notices reviewed by lawyers. Moreover, the jury could have found Lustigman's testimony to be partially or wholly incredible. While the Defendants spend most of their motions drawing inferences and conclusions that are favorable to themselves concerning the advice of counsel (and thus inverting the proper Rule 29 standard), the jury was free to conclude that the Defendants' use of lawyers did not raise reasonable doubt about their intent to defraud. Indeed, a court "cannot reverse a conviction merely because the defendant's exculpatory account is plausible. Rather, we must affirm so long as, drawing all inferences in the government's favor, a reasonable jury might fairly have found

---

[2] Defendants argue that the Government opposed presentation of the advice-of-counsel defense involving the "reasonable consumer" advertising standard, *e.g.*, Denkberg Br. at 6. Such is not the case, and the Defendants in fact presented extensive evidence and argument about this advice. The Government opposed instructing the jury on the law of mail and wire fraud using a "reasonable consumer" standard that places the onus on the victim not to be deceived, rather than focusing on the Defendants' conduct and intent to defraud.

[the Defendants] guilty beyond a reasonable doubt." *Friedman*, 998 F.2d at 56. Indeed, as set forth below, the evidence the Defendants presented supported the Government's case more than their advice-of-counsel defense, and the jury was free to so conclude. *Maniego*, 710 F.2d at 28; *Velasquez*, 271 F.3d at 371–72.

> **i.    The jury was free to reject Lustigman's testimony in whole or in part, because the jury could have found Lustigman's testimony was not credible and undermined the advice-of-counsel defense.**

The jury need not have accepted Lustigman's testimony to the degree the Defendants argue—indeed, the jury could have rejected his testimony in its entirety in accordance with the Court's instruction on witness credibility. Tr. at 1860–65 (jury charge noting that witness testimony may be credited in whole, part, or not at all). Ample grounds exist to question Lustigman's credibility and his recall of events, including but not limited to:

- Lustigman's grudging, partial acknowledgement of his continued representation of the Defendants and legal acts he took in 2021 on their behalf and that he was still trying to get money for them, all in contradiction to his earlier testimony that he had not represented them since 2017. Tr. at 1560–66.

- Lustigman's testimony to the effect that the settlement of the 2012 Postal administrative actions posed no bar to the Defendants' continuation of the scheme and his failure to acknowledge that the Defendants agreed that their scheme would be "permanently discontinued and abandoned." Tr. at 1544–50 (Lustigman); GX 14, 15; Tr. at 386–87, 398–99 (Edgehille). This was especially damaging to Lustigman's credibility on cross-examination, when he discussed differences between two versions of the same prize notice, one from before the 2012 Postal actions and one from September 2016, from which the jury could have concluded that the Defendants' scheme was unchanged at its core, and to the

extent the prize notice was different, it was more misleading four years after the Postal actions than before.  Tr. at 1568–76; GX 121, 671.  For example, the earlier version did not reference guaranteed cash sweepstakes prizes and the "disclaimer" language was much more extensive on both the front and back of the prize notice and included an address where a victim could request a refund.  Tr. at 1573–76.

- Lustigman's testimony that he knew the Defendants were providing services for Phillips, Priolo, and Jeffrey Novis, and that "there was concern as to what that company was doing—those other companies, that it could somehow implicate Sean and Gary."  Tr. at 1577 (Lustigman).  Here, the jury could have concluded that Lustigman conceded the essential criminality of the "sweeps report business" the Defendants were engaged in.  Worse yet and devastating to Lustigman's credibility, instead of advising the Defendants to totally disassociate themselves from those individuals and their (criminal) activities, Lustigman merely advised them to move the caging out of their office, as shown in GX 268.  Tr. at 1577–78 (Lustigman).  From this, a rational jury could have concluded that Lustigman was "in on it," understood that the scheme was unlawful, and was knowingly providing advice amounting to mere pretext.

On the latter point, here Lustigman's testimony effectively undermined the entire advice-of-counsel defense.  Once he testified that he and the Defendants had discussed the "concern" about what Phillips, Priolo, and Jeffrey Novis were doing and the possibility that the Defendants would be "implicated" in those activities, a rational jury could have concluded that the Defendants ignored that advice and continued to aid and abet those prize-notice schemes as set forth above in Section III.E.  While the Defendants (a) do not appear to defend Counts 16–19 on the basis of advice of counsel, and (b) even claim in their Rule 29 motions that there is no

evidence that they knew what Phillips, Priolo, and Jeffrey Novis were doing, the jury was free to infer from Lustigman's testimony that not only were the Defendants well aware of what those individuals were doing—because they discussed it with Lustigman, who advised them to limit that relationship to some degree—but also that the Defendants rejected that advice because they did not share Lustigman's "concern" about the criminality of the Priolo-Novis and Phillips prize-notice schemes, much the same way the Defendants were unconcerned by the criminality of their own prize-notice scheme.

Finally, the Defendants argue that because of conflicts between Solomon's and Lustigman's testimony, Solomon's testimony must be disregarded and Lustigman's testimony stands as determinative of the Defendants' guilt, particularly around the issue of Solomon's knowledge of the 2012 Postal actions, GX 14 and 15. *See, e.g.*, Denkberg Br. at 9. But it is not the Defendants' role to determine witness credibility and resolve factual inconsistencies, particularly where all inferences must be drawn in favor of the Government. Rather, the jury is "entitled to reject the extremes of the testimony and conclude that the truth l[ies] somewhere in between." *United States v. Cote*, 544 F.3d 88, 99 (2d Cir. 2008). Further, it is within the province of the jury "to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony." *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011). Particularly when Lustigman's testimony could be understood to mean that he was effectively the Defendants' co-conspirator, a rational jury could have concluded that Solomon's testimony was entirely credible, and Lustigman's not credible.

ii.     **Sufficient evidence supports a finding that the defendants did not seek legal advice in good faith.**

Fundamental to the question of advice of counsel is the issue of good faith—here, the Defendants argue that there is "no evidence" of bad faith because of the Defendants' self-serving statements that they wanted to comply with the law, and that the testimony of various witnesses render the advice-of-counsel defense "dispositive" on the issue of guilt. *See, e.g.*, Denkberg Br. at 5; Novis Br. at 5–6. Nevertheless, extensive evidence demonstrates that the jury could have concluded otherwise, including documentary evidence that the Defendants' analysis ignores.

Lack of good faith is evident from the prize notices themselves, which are written in confusing, dense language with intentionally confusing jargon like "entrant directives" that only the Defendants and their co-conspirators could define, in place of plain language that sounded "too true." Tr. at 780 (Ressler). The prize notices made promises like the victim is "**<u>The Identified Individual</u>**" and that the notice concerns "**$Amount of the Monies/Prize, which you will definitely receive**"[3] upon receipt of the victim's payment. *See, e.g.*, GX 131 (emphasis in original). Witness testimony included that the prize notices (including GX 131, dated September 2, 2016) were intended to make the recipient believe they were individually selected to receive the mailing, as if they had already won. Tr. at 764, 775, 785 (Ressler). There is sufficient evidence of mail fraud, including lack of good faith, where (as here) there is evidence of systematic deception. *United States v. Somerstein*, 971 F. Supp. 736, 741 (E.D.N.Y. 1997); *see also United States v. Gole*, 21 F. Supp. 2d 161, 166 (E.D.N.Y. 1997) (noting that good faith

---

[3] Under rules of usage and grammar, placement of the modifying clause "which you will definitely receive" indicates that it modifies "Monies/Prize," whereas the Defendants would undoubtedly suggest that the modifier applies to "Newsletter of detailed entrant directives" at the beginning of the sentence, which association does not comport with usage and grammar principles. *See, e.g.*, William Strunk Jr. & E.B. White, The Elements of Style (Longman Publishers, 4th ed., 2000) at 13–14, 30–31.

depends upon "the representations made by the defendant, and on the intent with which he made them").

Private correspondence between co-conspirators also revealed the lack of good faith that pervaded the Defendants' "business," and demonstrated beyond reasonable doubt that the Defendants lacked any "honest belief in the truth of the representations made" in their prize notices. Tr. at 1880 (jury charge on good faith). For example, a May 2016 email from co-conspirator Shawn Phillips to Defendant Novis states that a prize notice is not "pulling well" because the prize notice says too many times that the recipient has not won any money and that the mailing is not an awards notification. GX 361. A rational jury was free to conclude that the Defendants lacked good faith from the fact that Defendants and their co-conspirators discussed amongst themselves the necessity to withhold truthful statements in order to maximize profits, especially where that e-mail was sent only a few months before the scheme ended. *Shellef*, 732 F. Supp. 2d at 57 (sufficient circumstantial evidence provided rational basis for jury to conclude that defendant's false representation not made in good faith).

The Defendants' receipt of voluminous complaints also provides the jury with sufficient grounds to conclude that the Defendants lacked good faith. *United States v. Press*, 336 F.2d 1003, 1010 (2d Cir. 1964) (complaints called to defendants' attention demonstrated intent to defraud and lack of good faith, when knowledge of complaints was followed by failure to change promotion materials); *United States v. Kuthuru*, 665 F. App'x 34, 40 (2d Cir. 2016) (submission of false billings after being notified of their falsity supported conclusion that defendant knew of the fraud and willfully participated in it). The testimony of Postal Inspector Rodriguez included the introduction of numerous examples of victims' statements of belief in having won money, as well as letters from attorneys general and district attorneys, other government officials, consumer

33

advocates, and victims, dating throughout the charged conspiracy. *See, e.g.*, Tr. at 1102–29, 1190–1207 (Rodriguez). Solomon testified that the Defendants never asked him to revise their prize notices because they were being misunderstood. Tr. at 865 (Solomon). The Government also presented evidence that the Defendants tracked and discussed government enforcement efforts against schemes like theirs, from which the jury could conclude that the Defendants knew their scheme was illegal. Tr. at 1174–89 (Rodriguez). Collectively, this evidence could lead a rational jury to conclude the Defendants knew their scheme was illegal and that their mailings in fact deceived people. Thus, the jury was free to conclude the Defendants possessed no good faith, particularly where consumer complaints did not prompt changes in the Defendants' business practices. *Press*, 336 F.2d at 1010.

Finally, the lack of good faith is shown by the Defendants' responses to victim complaints and expressions of belief in having won money or prizes. Rather than change their prize notices to make them easily understandable, Defendants would respond to victims' correspondence with language to the effect that the victims were free to request refunds, and that the victims had "misunderstood" the prize notices—these included the "rules letter" (also referred to as a "customer service" letter) and refund letters. *See, e.g.*, GX 325, 353, 347, 379, 487; Tr. at 605–06, 626–27 (McDevitt); Tr. at 1204–09, 1479–82 (Rodriguez). The jury was free to conclude that in standard "customer service" correspondence to victims, the Defendants were being deliberately obtuse, were acting in their own financial interest, were aware that their prize notices deceived people into sending money, and in the absence of any change to their business practices over many years, that the Defendants intended that result. *Press*, 336 F.2d at 1010.

iii.    **The Defendants did not consult with counsel for the purpose of securing advice on the lawfulness of their possible future conduct.**

Extensive evidence demonstrates that Defendants did not seek advice in order to understand the lawfulness of their possible future conduct, but rather to paper their files so that they might hope to evade sanction from the government and eventual prosecution on the basis of an advice-of-counsel defense. For example, Defendant Denkberg emailed the lawyers in August 2016, obviously upset after learning of Postal Inspectors' surveillance of a post office the Defendants used and agents' questions about one of their post office boxes. GX 268. Amongst other things, the email notes that the 2012 Postal actions rendered the Defendants "PERSONALLY liable" for subsequent misconduct and asked whether in light of that and other circumstances it was "a good idea to review the SIX promotions that are currently going to the post office in question." *Id.* (capitalization in original).

In light of this email, it was rational for a jury to conclude this email demonstrates not concern for the "lawfulness of [the Defendants'] possible future conduct," but rather, concern for the Defendants' liability for <u>past</u> conduct that federal law enforcement agents are actively investigating. *Id*. Moreover, Denkberg did not request review of all of their prize notices—only the six prize notices he felt the investigators knew about and which directed responses to that particular post office. As in other contexts that similarly suggest lack of good faith, *supra* at Sections III.A.iii and III.F.ii, here the Defendants express no concern about their prize notices' effect on victims; instead, they merely conclude that the lawyers will continue to absolve them of any responsibility for their actions.

iv.    **The Defendants did not make full and accurate reports to their attorney of all material facts that they knew.**

Defendants claim they were "advised by counsel that [their] planned course of conduct is lawful." Denkberg Br. at 2. This is plainly untrue and is not reflected in the trial evidence and

35

testimony. Indeed, Lustigman's and Solomon's testimony shows that the Defendants withheld substantial types and amounts of information from their lawyers concerning the operation of the scheme. Trial evidence and testimony demonstrates that the Defendants did not discuss their "course of conduct" with the lawyers, to include the mailing plans and how those plans identified persons who were susceptible to the scheme and then targeted those persons with a dozen or more follow-up prize notices in a short timeframe, each coming under color of a different fictional entity and signed by a different fictional person.

Neither lawyer testified that he or anyone else in the law firm was aware of (much less had reviewed) the mailing schedules, Solomon doing so expressly and stating that he knew nothing about the structure of the Defendants' mailing campaigns. Tr. at 864. Yet these mailing schedules were the principal backbone of the Defendants' scheme as well as the schemes embraced by Counts 16–19, serving as the means to identify persons vulnerable to the schemes and then target them repeatedly in short periods of time under cover of different fictitious names. *See, e.g.,* Tr. at 152–167 (Jacquard); Tr. at 1154–69 (Rodriguez); GX 152A at 1-3, 141-42; 152C at 1, 144-45, 171, 214-15; 152D at 1-5; 153A; 153B at 111-12; 154 at 32-37. On cross-examination, Lustigman conceded that his advice was only as good as the information provided to him, and that it was improper to use false names to deliberately confuse people and to use post office boxes to conceal who is sending fraudulent mail. Tr. at 1557–59 (Lustigman). The jury was thus free to conclude that the Defendants withheld the scheme's principal structure and their "course of conduct" from the lawyers and that the advice was not premised upon the Defendants' full disclosure about their business practices.

Moreover, the Defendants did not send all complaints to the lawyers. Both lawyers testified to the effect that their routine work was limited to reviewing the prize notices and

handling only the complaints that the Defendants sent to them, which for Solomon amounted to fewer than a dozen complaints over more than a decade.  Tr. at 850, 854–55 (Solomon); Tr. at 1508–12, 1525 (Lustigman).  Solomon testified that he was not aware the Defendants received complaints other than those few he handled.  Tr. at 855 (Solomon).  Lustigman's testimony about complaints was limited by defense counsel's question, "how would you deal with the complaints that were referred to you by them?"  Tr. at 1525 (Lustigman).  This questioning of Lustigman sidestepped the points that (a) the Defendants did not refer all complaints to the lawyers, and (b) that much of the correspondence indicating belief in having won a prize was not a "complaint," as such.  Correspondence introduced at trial included complaints as well as inquiries about the status of the prize awards and other statements evidencing belief in having won money or prizes.  *See, e.g.*, GX 379, 402, 419, 424, 479, 481.  The jury was thus free to conclude that the Defendants did not send all such correspondence to the lawyers and, as a result, withheld substantial evidence that people were deceived by the prize notices.

Finally, Defendant Novis sent an email to his co-conspirator Shawn Phillips, in which he states (amongst other things) that there are things only Phillips knew about the "business," that Novis had not "mentioned anything that we talk about to anyone and I mean [no] one," and that there is no other person with whom Novis would be as forthcoming about how his business operates.  GX 360.  From this, the jury was free to infer that the discussions between Novis and Phillips involved the kinds of secret, unsavory things the persons knowingly running a massive fraud might discuss, and that this information was withheld from the lawyers.

     **v.**    **Sufficient evidence supports a finding that the Defendants did not act strictly in accordance with the advice of their attorney in good faith.**

Sufficient evidence was introduced at trial for the jury also to conclude that the Defendants did not strictly follow the lawyers' advice.  Two examples of such instances were

addressed in the Government's summation, one of which Defendants attempt to explain away as being "grossly unfair" because the attorney had not yet approved a final version of the prize notice. Denkberg Br. at 11–12. This entirely misses the point of the Government's argument and what the jury could properly infer and conclude from the evidence as rational triers of fact. The Defendants knew well that the lawyers advised them to revise the piece, but they mailed it anyway without changes after receiving that advice. GX 127, 288, 299; Tr. at 1651–53 (Government summation). Defendants' argument improperly shifts focus to the lawyers, but it was the Defendants who chose to mail GX 127 after being told it required changes—i.e., they disregarded the advice they received.

Defendants' Rule 29 motions do not even address the second instance of their failure to strictly follow attorney advice that the Government addressed in its summation. In this instance, the Defendants mailed the RDD prize notice in September 2016 after being told to stop using a less egregious version of that prize notice the month before. GX 121, 308, 309; Tr. at 1653–55.

The record is replete with other examples of mailings that do not comport with prior advice. For example, in May 2012 and shortly after the Postal actions, lawyer Charles Chernofsky advised the Defendants: "An Accounting Department is commonly associated with finance. Here it is being used as a department that prepares the Report of Entry Procedures and Directives. Further, it could be inferred that this is a notice of payment." DX (D)G2 at Tab 9B, Bates DENKBERG01053. Nevertheless, in 2016 the Defendants sent prize notices purporting to come from "Accounting Offices." GX 135. In the same letter, Chernofsky advised the Defendants: "Payment is a term that should never be used in a Sweepstakes Report Promotion.

38

It can be interpreted to suggest that 'Payment' is to be made to the recipient of the promotion."[4] DX (D)G2 at Tab 9B, Bates DENKBERG01053. Yet this term was frequently used in prize notices in reference to prizes. *See, e.g.*, GX 129 at 2,4; GX 130 at 4. Sometimes the prize notices used the term "payout" instead of "payment," and still others used variations of the verb "to pay," all of which the jury was free to conclude "can be interpreted to suggest that 'Payment' is to be made to the recipient" of the prize notice. *See, e.g.*, GX 130, 131, 134, 135. While the Defendants will undoubtedly state in response that these promotions may have been lawyer-approved using the term "payment" and variations thereon, the jury was free to infer from such inconsistencies that the advice was a sham and that the Defendants did not care to follow it when doing so was not in their financial interest.

From all of this evidence, the jury was free to infer that the Defendants intended to defraud victims and reject the pretextual communications the Defendants had with their attorneys.

Dated: September 14, 2022          Respectfully submitted,

/s/ Charles B. Dunn
CHARLES B. DUNN
CAROLYN F. RICE
JOSEPH M. WILLIAMS
Trial Attorneys
Consumer Protection Branch
U.S. Department of Justice
(202) 305-7227
Charles.B.Dunn@usdoj.gov
Carolyn.F.Rice@usdoj.gov
Joseph.M.Williams@usdoj.gov

---

[4] Chernofsky also provided this advice on other occasions—*see, e.g.*, DX (D)G2 at Tab 10A, Bates DENKBERG01206, dated April 2007 and Tab 14A at DENKBERG01089–90, dated July 28, 2008.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true copy of the foregoing was filed with the

Court using the CM/ECF system electronically on this 14th day of September, 2022, and served

using the CM/ECF system to all counsel of record.

/s/ Carolyn F. Rice
Carolyn F. Rice
Trial Attorney